IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 19, 2024

## STATE OF TENNESSEE v. TIMOTHY ELIJAH OGBURN

**Appeal from the Circuit Court for Montgomery County**
**No. CC-2018-CR-1138      Robert Bateman, Judge**

_____

### No. M2023-01663-CCA-R3-CD

_____

A Montgomery County jury convicted the Defendant, Timothy Elijah Ogburn, of one count of first degree premeditated murder, two counts of attempted first degree murder, and two counts of employing a firearm during the commission of a dangerous felony. After a sentencing hearing, the trial court imposed a life sentence for the first degree murder conviction, forty years for each attempted murder conviction, and ten years for each employing a firearm during the commission of a dangerous felony conviction. The trial court ordered the sentences to run consecutively to one another for an effective sentence of life plus 100 years. On appeal, the Defendant asserts that: (1) the evidence is insufficient to support his convictions; (2) the trial court's sentence was excessive; (3) the trial court erred by not granting a new trial based on newly discovered evidence; and (4) the trial court erred by issuing a material witness bond for Devion Lisenby. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Chase T. Smith, Clarksville, Tennessee, for the appellant, Timothy Elijah Ogburn.

Jonathan Skrmetti, Attorney General and Reporter; J. Katie Neff, Assistant Attorney General; Robert J. Nash, District Attorney General; and Chris W. Dotson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
### I. Facts

This case arises from the Defendant's shooting at a car with three passengers and killing one of the passengers, Tanesha Hardy. For his role in this offense, the Montgomery

County grand jury indicted the Defendant for the first degree premeditated murder of Tanesha Hardy (Count 1), attempted first degree murder of Antonio Jett (Count 2), attempted first degree murder of Stephanie Beckles (Count 3), employing a firearm during the commission of a dangerous felony involving Antonio Jett (Count 4), employing a firearm during the commission of a dangerous felony involving Stephanie Beckles (Count 5), and for being a felon in possession of a firearm (Count 6).

## A. Material Witness Bond

In September 2021, before trial, the State filed a petition for a material witness bond for Devion Lisenby because the witness had "refused or will refuse to respond to process." The trial court denied the petition but noted that if the witness failed to comply with the subpoena the trial court would consider "appropriate relief" including a continuance of the hearing date and issuance of bail for the material witness.

In May 2022, the State filed a second request for a material witness bond. The State offered that because Mr. Lisenby was in the car with the Defendant at the time of the shooting, he was a material witness. The State asserted that it had previously issued subpoenas for Mr. Lisenby on multiple occasions, including one occasion in court when Mr. Lisenby refused to sign, asserting that "they" needed to find someone else for the hearing. The trial court had granted, upon oral motion, a material witness bond "on or about October 4, 2021;" however, the State was unable to locate Mr. Lisenby. The State asked the trial court to grant the State's request and order a material witness bond for Mr. Lisenby. This time the trial court issued an order for a $50,000 material witness bond for Mr. Lisenby to appear at the trial scheduled for May 16, 2022, and Mr. Lisenby was apprehended and held until trial.

## B. Trial

The trial proceeded on May 16, 2022, during which the parties presented the following evidence: On the night of May 22, 2018, the Defendant's mother, DeQuita Corbin, called 911 to report that someone had fired a gun at her home. She and her daughter then fled the premises. She denied calling the Defendant, maintaining that she only called 911.

On that same evening, Tanesha Hardy had been released from the Montgomery County jail and arranged for her friends, Stephanie Beckles and Antonio Jett, to pick her up. Mr. Jett drove his Chrysler 300, and Ms. Beckles sat in the front passenger seat. When Ms. Hardy joined them, she sat in the back seat behind the driver. Mr. Jett drove by Waffle House for food on the way to "Mitchell," where Ms. Beckles was staying. Ms. Hardy made phone calls to "Shannon" and to her mother as they drove. Ms. Hardy's mother confirmed

- 2 -

that she spoke with Ms. Hardy twice that night. During the second phone call, Ms. Hardy's mother heard gunfire and then Ms. Hardy was no longer responsive.

Ms. Beckles recalled the route as they drove to "Mitchell." Mr. Jett drove up Boot Hill "by the old gas station" and then turned right on Locust. After the turn, she saw a car driving toward them. They were in the area "by the apartments" when multiple bullets hit the Chrysler. Ms. Beckles yelled, "go, go, go, go" and ducked down. Mr. Jett also attempted to duck down as he drove. The car Ms. Beckles had seen earlier was the same car that now was shooting at them. The car followed the Chrysler for a distance but then pulled into a driveway, backed out and drove in the opposite direction.

Mr. Jett continued fleeing until they were certain the car was no longer following them. Ms. Beckles turned to check on Ms. Hardy, and she saw large amounts of blood. Mr. Jett drove to Mitchell and parked in the driveway. Mr. Jett urged Ms. Beckles to take the phone from Ms. Hardy's hand so that they could call 911, but Ms. Beckles was too frightened and refused to take Ms. Hardy's phone. A police officer who had heard the gunfire arrived shortly thereafter.

Mr. Jett knew the Defendant by a nickname, "Bada**." After the shooting, the two men were incarcerated at the same jail.[1] Mr. Jett and the Defendant were assigned to the same pod. He explained that he was housed on the top tier, and the Defendant was housed on the lower tier. One day, Mr. Jett approached the Defendant and asked if he had shot at Mr. Jett's car. The Defendant confirmed that he had, and Mr. Jett asked why. The Defendant responded that, at the time, he had believed that the occupants of the Chrysler were the same people who had fired guns at his mother's house.

Jason Litchfield, the Montgomery County Sheriff's Office custodian of the housing records, provided housing records showing that the Defendant and Mr. Jett were housed in the same pod from December 19, 2018, through January 26, 2019, and that the men were housed within the unit consistent with Mr. Jett's testimony.

Clarksville Police Department ("CPD") Officer Andrew Trescott was concluding a traffic stop at 12:35 a.m., on May 23, 2018, when he heard what he thought was fireworks but then realized it was about twenty gunshots. The shooting lasted for approximately ten to fifteen seconds and was coming from the Chapel Street area of New Providence. Officer Trescott proceeded to the area and some residents flagged him down. One resident told him that he heard the shooting and then saw two vehicles, a black Honda Civic and a

---

[1] Mr. Jett testified that he was in jail for assault and petty theft of a cell phone. The charges had since been dropped because the victim had died.

Chrysler 300, turn off Locust onto E Street. Officer Trescott continued patrolling when Mr. Jett flagged him down at the corner of Mitchell and Market.

Mr. Jett directed Officer Trescott to a Chrysler 300 parked in the driveway. Inside the vehicle, he found a female slumped over in the back seat behind the driver's seat. Emergency medical services arrived and transported the female, identified as Ms. Hardy, to the hospital.

Later that night, Officer Trescott located a person of interest, Devion Lisenby, at an apartment building on Beech Street. He transported Mr. Lisenby for questioning.

CPD Officer Scott Beaubein processed the Chrysler 300. He found bullet holes in the rear of the vehicle. He also found bullets from the rear that had traveled into the passenger compartment and through the cushions of the back seat. There were red-brown stains consistent with blood in the back seat. Officer Beaubein found eleven strikes on the vehicle concentrated at the rear of the vehicle. Police also found bullet fragments in the passenger area and the trunk. Police did not find any weapons or unspent ammunition during the search of the inside of the car.

CPD Officer Adam Post searched the area where the shooting occurred and found shell casings and projectiles on Locust Street en route to E Street and on E Street. The recovered shell casings were both 7.62-caliber and .45-caliber.

Dominque Allen, an eyewitness to the events surrounding the shooting, lived on Beech Street in an apartment building. On the night of May 22, 2018, Mr. Allen was standing with Mr. Lisenby on the second-floor balcony of the apartments overlooking the parking lot. He noticed a group of people and a couple of cars in the parking lot. Mr. Allen did not know whether the Defendant lived in the apartment complex, but he had seen the Defendant at the apartment complex before. Mr. Allen overheard the Defendant on a phone call during which the Defendant learned that his mother's home had been "shot up." After the phone call ended, the Defendant went "to some apartment" and retrieved an assault rifle. The Defendant approached Mr. Lisenby and accused him of knowing who had fired on his mother's house. Mr. Lisenby left with the Defendant but "[n]ot willingly." Mr. Allen described the interaction as follows:

> Basically, [Mr. Lisenby] had his hands up in, like, I want to say, a defenseless maneuver, like, hands up, like he ain't have nothing to do with it. And [the Defendant] was shoving him in the back with the AK-47, like, walk, basically. . . . forcing [Mr. Lisenby] down the steps[.]

Mr. Allen went inside his apartment for about ten minutes. When he returned outside, Mr. Allen could smell sulfur in the air. To him, it smelled like someone had either set off fireworks or there had been gunfire. He recalled hearing "an individual [say] my cousin just got shot."

Devion Lisenby recounted the events leading up to his witnessing the shooting consistently with Mr. Allen, recalling that the Defendant forced him into a car with an AK-47 on the night of May 22, 2018. The Defendant and Mr. Lisenby were in the back seat of the car with the Defendant seated behind the front passenger. They drove toward New Providence Boulevard. At a stop sign, Mr. Lisenby saw another car stop and then drive through the intersection. They followed the car, and the Defendant lowered his window and "[l]et off a couple shots." After the Defendant fired his gun at the other car, they "turned off," and Mr. Lisenby got out. Mr. Lisenby returned to Beech Street where police officers took him into custody. Police interviewed Mr. Lisenby at the police station, and he denied any knowledge of the shooting.

CPD Police Sergeant Michael Ulrey was the lead investigator in this case and took the Defendant into custody on May 24, 2018, at the Quality Inn in Hopkinsville, Kentucky. During the arrest, Sergeant Ulrey confiscated an iPhone. CPD Officer Debra Kolofsky searched the phone and found the phone was named "Timothy's iPhone" and the Apple ID was TimothyOgburn18@gmail.com. Officer Kolofsky extracted a call log from the phone which reflected a phone call from a contact listed as "Mom." The call log showed three calls on May 23, 2018, from the contact "Mom" placed at 12:27 a.m., 12:29 a.m., and 12:38 a.m. All these calls went unanswered.

David Zimmerman, a Davidson County Medical Examiner, conducted the autopsy on Ms. Hardy's body. The examination revealed four gunshot wounds, and Dr. Zimmerman collected multiple bullet fragments from the victim's body. Dr. Zimmerman opined that the cause of death was multiple gunshot wounds, and the manner of death was homicide.

Conner Lamberson, a Tennessee Bureau of Investigation special agent, examined eleven 7.62 by 39-millimeter cartridge cases (also referred to as .30 caliber) collected from Mitchell Street. All these cartridge cases shared the same class characteristics and similar individual characteristics. Special Agent Lamberson associated AK-47 or SKS-style firearms with .30 caliber ammunition. Law enforcement also collected four .45 caliber cases from Mitchell Street. Upon examination, Special Agent Lamberson concluded that all four cartridge cases were fired from the same unknown .45 ACP-caliber firearm. Finally, Special Agent Lamberson examined fragments and a bullet jacket recovered during the autopsy. He determined that the bullet jacket and small fragments were consistent with a .30 caliber, "which is the 7.62."

This concluded the State's proof, and the Defendant filed a motion for judgment of acquittal, which the trial court denied. The Defendant offered no further evidence.

After hearing this evidence, the jury convicted the Defendant of one count of first degree premeditated murder, two counts of attempted first degree murder, and two counts of employing a firearm during the commission of a dangerous felony.

## C. Sentencing

At the August 4, 2022 sentencing hearing, the trial court entered the presentence report into evidence. The State offered six certified convictions in support of the trial court's finding the Defendant a Range II offender for sentencing purposes. The convictions were for aggravated robbery, attempted aggravated robbery, possession of a weapon by a convicted felon, and attempted aggravated burglary.

Ms. Hardy's twenty-three-year-old daughter, Alexis Hardy, read her statement aloud, detailing the impact of Ms. Hardy's death on their family. She described her loss as "beyond words" and the Defendant's decision to take the life of an innocent bystander as "unimaginable." She concluded by asking the trial court to impose the maximum sentence possible "for the cold-hearted and brutal murder of [her] mother."

The State asked the trial court to consider four enhancement factors in sentencing the Defendant: factor (1) a previous history of criminal convictions in addition to those necessary to establish the appropriate range; factor (3) the offense involved more than one victim; factor (9) the defendant possessed or employed a deadly weapon during the commission of this offense; and factor (10) the defendant had no hesitation about committing a crime when the risk to human life was high. T.C.A. §40-35-114 (1), (3), (9) and (10).

The State also argued, pursuant to Tennessee Code Annotation section 40-35-115, that consecutive sentencing was appropriate in this case because the Defendant was an offender whose record of criminal activity was extensive, and the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. The Defendant asked that the trial court order a sixty-six-year sentence. The State asserted that consecutive sentences were necessary to protect the public and the length of the sentence reasonably related to the severity of the offenses for which the Defendant had been convicted.

The trial court stated that it had considered the principles and purpose of sentencing, the evidence at trial and the sentencing hearing, the presentence report, the nature of the criminal conduct, and the arguments of counsel. The trial court imposed a life sentence for the first degree premeditated murder conviction. Next, it considered the sentencing range for Counts 2 and 3, attempted first degree murder. The trial court found that the Defendant was a Range II offender based upon his prior convictions; thus, the sentencing range for Counts 2 and 3 was twenty-five to forty years. The sentencing range for Counts 4 and 5 was six to ten years.

The trial court considered and applied enhancement factor (1), that the defendant had a previous criminal history in addition to those necessary to establish the appropriate range. Next the trial court applied enhancement factor (3), that the offenses involved more than one victim. The trial court also found applicable enhancement factor (9), that the Defendant employed a firearm during the commission of the offenses in Counts 1, 2, and 3. Finally, the trial court applied enhancement factor (10), that the Defendant had no hesitation about committing a crime when the risk to human life was high. T.C.A. §40-35-114 (1), (3), (9) and (10). The trial court did not find any applicable mitigating factors.

In determining the appropriate sentence, the trial court specifically noted that "eleven shots [were] released in a neighborhood and [displayed] a wanton disregard for human life." The trial court also noted that the Defendant fired numerous shots from an AK-47 resulting in one death and two attempted murder charges and that the gun discharge pattern indicated that the gunfire followed the victim's vehicle. Thus, the trial court ordered the maximum sentence in the range for each count: forty years for each count of attempted first degree murder; and ten years for each count of employing a firearm with the intent to go armed as a dangerous felon.

The trial court then considered the alignment of the sentences. The trial court found that the Defendant had an extensive record of criminal activity, the Defendant was a professional criminal, and the Defendant was a dangerous offender. The trial court noted that any of those factors independently would support consecutive sentencing. The trial court further found that, consistent with *State v. Wilkerson*, consecutive sentencing was necessary to protect the public from further criminal acts and that the sentence imposed reasonably related to the severity of the Defendant's offenses. 905 S.W.2d 933 (Tenn. 1995).

At the conclusion of the hearing, the trial court imposed a life sentence for the first degree premeditated murder conviction, forty years for each conviction for attempted first degree murder, and ten years for each employing a firearm during the commission of a dangerous felony conviction. The trial court ordered all sentences to be served

consecutively, for an effective life sentence plus one hundred years. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that: (1) the evidence is insufficient to support his convictions; (2) the trial court's sentence was excessive (3) the trial court erred by not granting a new trial based on newly discovered evidence; and (4) the trial court erred by issuing a material witness bond for Mr. Lisenby.

## A. Sufficiency of the Evidence

The Defendant argues that the State failed to prove that he was the one who fired the shots that killed Ms. Hardy; therefore, the trial court should have granted the Defendant's motion for judgment of acquittal. The State responds that the trial court properly denied the Defendant's motion for judgment of acquittal because the evidence was sufficient to sustain his convictions. We agree with the State.

We apply the same standard when reviewing whether a trial court erred in denying a motion for judgment of acquittal as when reviewing whether the evidence was sufficient to sustain a conviction. *See State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); *State v. Adams*, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995). When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn.1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The evidence, viewed in the light most favorable to the State, showed that the Defendant was at an apartment complex located on Beech Street when he learned that someone had fired upon his mother's house. The Defendant retrieved an AK-47 from an apartment, and then forced Mr. Lisenby to go with him to find the shooters. Mr. Lisenby and the Defendant were passengers in the car when a Chrysler 300 passed by them. The vehicle the Defendant was in followed the Chrysler 300 and fired on the vehicle multiple times. Bullets found at the scene were consistent with the weapon the Defendant carried that night. Further, after the Defendant's arrest, he admitted to Mr. Jett that he fired at Mr. Jett's vehicle because he believed the passengers were involved with the shooting of his mother's house. This evidence is sufficient to support the Defendant's convictions for firing a gun at the three occupants of the Chrysler 300, resulting in the death of Ms. Hardy.

The Defendant briefly references an assertion that the trial court was not specific enough in its denial of his motion for a judgment of acquittal. Our review of the record does not support this assertion. Pursuant to Tennessee Rule of Criminal Procedure 29, the trial court considered the evidence under the proper standard and denied the motion. The Defendant is not entitled to relief as to this issue.

## B. Sentencing

The Defendant asserts that the trial court erred by ordering the maximum sentences for Counts 2 and 3, attempted first degree murder. Specifically, the Defendant argues that the trial court misapplied enhancement factors and improperly assigned consecutive sentencing to his convictions. The State responds that the trial court acted within its discretion to impose within range sentences. We agree with the State.

### 1. Enhancement Factors

When a defendant challenges the length or manner of service of a within-range sentence, this court reviews the sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of the Sentencing Act." *Id.* at 707.

A trial court must consider the following factors when determining a sentence: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the defendant in his own behalf; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A §§ 40-35-102, -103, -210(b); *see also Bise*, 380 S.W.3d at 697-98. Additionally, the sentence imposed "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4). The weighing of various enhancement and mitigating factors is within the sound discretion of the trial court. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). This court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709.

In this case, the trial court properly considered the factors set out in Tennessee Code Annotated section 40-35-210 prior to ordering the Defendant's sentences. The trial court relied on enhancement factors (1), (3), (9) and (10) in determining the Defendant's sentence. *See* T.C.A. §§ 40-35-114 (1), (3), (9) and (10). The Defendant takes no issue with the trial court's application of enhancement factor one, admitting to his criminal history. We agree that the Defendant's prior convictions justified the application of enhancement factor (1), that the Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range. *See* T.C.A. § 40-35-114(1).

The trial court applied enhancement factor (3), that the offense involved more than one victim. *See* T.C.A. § 40-35-114(3). The Defendant contends that the trial court erred when it enhanced his sentence based upon the multiple victims enhancement factor. We agree. Although the evidence showed that several occupants were in the Chrysler 300 when the Defendant fired numerous times at the vehicle, the Defendant was charged separately with offenses which identified Antonio Jett and Stephanie Beckles as the victims in Counts 2 and 3. *State v. Imfield*, 70 S.W.3d 698, 706 (Tenn. 2002) (stating that the multiple victims enhancement factor did not apply to a conviction which was obtained based upon a named victim); *See also, State v. Reid*, 91 S.W.3d 247, 310-11 (Tenn. 2002); *State v. Williamson*, 919 S.W.2d 69, 72 (Tenn. Crim. App. 1995). Thus, the trial court improperly applied enhancement factor (3).

The trial court properly found enhancement factor (9), that the Defendant employed a firearm during the attempted murders as use of a firearm is not an element of attempted murder. *See* T.C.A. § 40-35-114(9); *State v. Carter*, 986 S.W.2d 596, 598 (Tenn. Crim. App. 1998). Finally, the trial court found enhancement factor (10), that the Defendant had no hesitation about committing a crime when the risk to human life was high, applicable on all counts because of the Defendant's lack of hesitation about shooting numerous times at an unknown vehicle at night in a neighborhood setting. *See* T.C.A. § 40-35-114(10). The trial court reasoned that the Defendant's conduct showed a "wanton disregard for human life." We agree.

A trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the Sentencing Act. Despite the trial court's misapplication of enhancement factor (3), the sentences imposed were within the statutory range and consistent with the purposes and principles of sentencing, and accordingly, we affirm the sentence imposed. *Bise*, 380 S.W.3d at 706-10.

## 2. Consecutive Sentencing

In *State v. Pollard*, 432 S.W.3d 851 (Tenn. 2013), the Tennessee Supreme Court expanded its holding in *Bise* to also apply to decisions by trial courts regarding consecutive sentencing. *Id.* at 859. The appellate courts must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *Id.* at 861. "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." *Id.* at 862 (citing *State v. Dickson*, 413 S.W.3d 735 (Tenn. 2013)). An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." T.C.A. § 40-35-102(1); *see State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). In addition, the length of a sentence must be "no greater than that deserved for the offense committed." T.C.A. § 40-35-103(2); *see Imfeld*, 70 S.W.3d at 708.

The trial court ordered a life sentence, two forty-year sentences and two ten-year sentences to all be served consecutively. In reaching this result, the trial court applied Tennessee Code Annotated section 40-35-115(b)(1), that "defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood, Tennessee Code Annotated section 40-35-115(b)(2), that "defendant is an offender whose record of criminal activity is extensive," and Tennessee Code Annotated section 40-35-115(b)(4), that "defendant is a dangerous offender." A trial court need only find, by a preponderance of the evidence, that at least one of the seven categories in Tennessee Code Annotated section 40-35-115(b) is applicable, to order multiple offenses be served consecutively. T.C.A. § 40-35-115(b). Here, the trial court examined the Defendant's record of criminal history, considering the Defendant's six prior felony convictions and multiple misdemeanors. Additionally, the presentence report reflects the Defendant's admission to an introduction to "gang life in his childhood" and that he had been a member of the "5-Deuce." Because the trial court properly ordered consecutive sentencing based on Tennessee Code Annotated section 40-35-115(b)(2), we find it unnecessary to examine the propriety of ordering consecutive sentencing based on other grounds. Consequently, we find that the trial court was well within its discretion in applying the above-mentioned consecutive sentencing factor and, therefore, the Defendant is not entitled to relief as to this issue.

### C. Newly Discovered Evidence

The Defendant argues that the trial court erred in not granting a new trial based upon newly discovered evidence. At the motion for new trial, the Defendant submitted an affidavit from his brother. The affidavit stated that the Defendant's brother learned that Mr. Lisenby had recanted and that he had obtained a recording of Mr. Lisenby recanting. The trial court inquired as to whether Mr. Lisenby was present to testify to his recantation, and the Defendant's attorney responded that the State had subpoenaed Mr. Lisenby but that

Mr. Lisenby was not present. Defense counsel added that he had recently seen Mr. Lisenby and knew that Mr. Lisenby was "in town." Defense counsel asked the trial court to consider the proof for "impeachment purposes."

The State responded that the recanting witness was not present and that there was no hearsay exception allowing the Defendant's brother to testify about Mr. Lisenby's alleged statement. The State further argued that there was other evidence from Mr. Jett and Mr. Allen linking the Defendant to these crimes and that, for impeachment purposes, the jury had heard that Mr. Lisenby initially lied to the police, denying any knowledge of a shooting.

The trial court made the following findings:

> As to the affidavit presented by [the Defendant's brother], the Court believes that [ ] -- a new trial may be granted based upon recanted testimony when -- and there are three factors:
>
> The trial judge is reasonably satisfied the testimony given by the material witness was false and the new testimony is true.
>
> The defendant was reasonably diligent in discovering the new evidence and was surprised by the false testimony and was unable to know of the falsity until after the trial.
>
> And number 3, that the jury might have reached a different conclusion had the truth been told.
>
> I don't have before me Mr. Lisenby's testimony that he is recanting what he said. I also would make a separate finding on this issue that there was other [trial] testimony, other than Mr. Lisenby's testimony, including the testimony of Antonio Jett, that would support the conviction of this defendant.

"Whether the trial court grants or denies a new trial on the basis of newly discovered evidence rests within the sound discretion of the trial judge." *State v. Caldwell*, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997) (citing *Hawkins v. State*, 417 S.W.2d 774, 778 (Tenn. 1967)). Accordingly, we must review the trial court's decision to grant or deny a new trial for an abuse of discretion. *State v. Bowers*, 77 S.W.3d 776, 784 (Tenn. Crim. App. 2001) (citing *State v. Meade*, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996)).

"A new trial may be granted because of recanted testimony when: (1) the trial judge is reasonably well-satisfied that the testimony given by a material witness was false and that the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, was surprised by false testimony, or was unable to know of the falsity until after the trial; and (3) the jury might have reached a different conclusion had the truth been told." *State v. Housler*, 193 S.W.3d 476, 494 (Tenn.2006); (citing *State v. Mixon*, 983 S.W.2d 661, 666 (Tenn.1999)).

First, although the trial judge made no specific findings about the first prong, he determined that the affidavit itself was not sufficient for the Court to set aside a conviction. Most obviously, the affidavit was not from Mr. Lisenby, the person alleged to have recanted his testimony. Mr. Lisenby was not present at the hearing to recant his trial testimony. Therefore, the trial court presumably found the Defendant's brother's statements about Mr. Lisenby's recantation not credible or admissible, since a new trial was not ordered. We agree with this conclusion. Further, it does not appear that the Defendant was "diligent" in obtaining the evidence. At the time of the trial, the Defendant was in the unique position of having known whether Mr. Lisenby's testimony was false. Therefore, the Defendant could not have been "surprised" by Mr. Lisenby's trial testimony or unaware of whatever he now asserts is false. Finally, as the trial court correctly observed, there was other evidence establishing the Defendant's guilt, including witness accounts, ballistic evidence, and the Defendant's admission to Mr. Jett of his role in and motive for the shooting. Under these circumstances the trial court properly denied a new trial based on recanted testimony.

### D. Material Witness Bond

The Defendant contends that the trial court erred when it issued a material witness bond for Mr. Lisenby. He recites the procedural history of the State's request for a material witness bond and then asserts that "the Material Witness Bond was used to leverage the testimony of Mr. Lisenby" without any argument or citation to evidence from the record to support this contention. Additionally, he offers no legal authority in support of his challenge to the trial court's grant of the material witness bond. Failure to provide legal argument, citation to the record, or citation to authority results in waiver of the issue on appeal. Tenn. R. App. P. 27; Tenn. Ct. Crim. App. R. 10(b). Accordingly, we conclude that the Defendant has waived review of this issue.

### III. Conclusion

Based upon the foregoing reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE